**So Ordered.**

**Dated: March 25th, 2024**



**Whitman L. Holt
Bankruptcy Judge**

*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Case No. 23-00590-WLH13 |
| CALVIN SCOTT PAGE and HELEN VILLABANE PAGE, | **MEMORANDUM OPINION** |
| Debtors. | |

Repayment of a debt generally involves both a quantitative aspect (how much the debtor will pay) and a temporal aspect (when the payments will be made). For most debts, these key components can be reconfigured and framed as principal amortization, interest accrual, and maturity. With limited exceptions (such as so-called "perpetual bonds"), however, it is not possible to understand how a debt will be repaid without addressing **both** quantitative and temporal aspects.

The specific dispute here involves a disagreement between chapter 13 debtors and the chapter 13 trustee regarding the debtors' proposed repayment of certain vehicle loans. The parties agree about the quantitative aspect—the loans should be repaid in full—but disagree about what bankruptcy law requires or permits regarding the temporal aspect. For reasons explained below, the court agrees with the chapter 13 trustee's primary legal position, finds that the debtors' proposed plan is unconfirmable, and therefore dismisses this case.

### BACKGROUND & PROCEDURAL POSTURE

The debtors are a married couple who owe, among other debts, amounts borrowed to facilitate their purchase of motor vehicles. Two of those loans arise

from vehicles the debtors purchased a few months before filing a chapter 13 bankruptcy petition. The key details of the two loans are:

| Vehicle | Lender | Petition Date Debt Balance | Contractual Interest Rate | Contractual Maturity Month |
|---|---|---|---|---|
| 2021 Ram 1500 | Spokane Teachers Credit Union | $47,323.71 | 5.49% | November 2029[1] |
| 2023 Hyundai Santa Cruz | Global Federal Credit Union | $49,390.75 | 6.84% | December 2029[2] |

The debtors filed chapter 13 bankruptcy in May 2023 and proposed a chapter 13 plan that would repay both vehicle loans in full within the 60-month term of their plan (i.e., by June 2028)[3] and therefore earlier than each loan's contractual maturity date. The plan thus reamortizes these longer-term vehicle loans and, in doing so, contemplates a payment from the chapter 13 trustee to the vehicle lenders that would be materially larger than the contractually scheduled repayment amounts. Because the proposed plan is a "base plan" that does not repay all the debtors' creditors in full,[4] the net economic effect of accelerated repayment of the vehicle loans is a reduction of the funds remaining for a dividend to the debtors' unsecured creditors.

The debtors' approach in their proposed plan regarding these two vehicle loans carried over to their responses on the required Official Form 122C-2 (*Chapter 13 Calculation of Your Disposable Income*). More specifically, the debtors listed as the "average monthly payment" for each vehicle the amount of the proposed monthly plan payment (i.e., the increased amount after reamortizing the total debt over 60 months).[5] An end consequence of this listing is to increase the deductions the debtors claim from their current monthly income, which in turn

---

[1] *See* Proof of Claim No. 1-3. The contract attached to this proof of claim references a 5.74% interest rate, but the proof of claim (and further papers filed by the creditor) only asserts a 5.49% contractual rate. The court has been unable to reconcile the difference.

[2] *See* Proof of Claim No. 8-1. The purchase agreement reflects that the debtors purchased this vehicle new, with only 15 miles on the odometer. *See id.* at p. 6 of 10.

[3] *See* ECF No. 2 subparts 2.1, 2.6, 3.2.4.

[4] *See id.* subparts 2.5, 5.2.1.

[5] *See* ECF No. 1 at p. 50 of 62.

decreases the debtors' monthly disposable income under Bankruptcy Code section 1325(b)(2) (a statutory provision that calibrates creditors' baseline entitlements regarding a chapter 13 plan).[6]

Additionally, the debtors have a third vehicle loan with Horizon Credit Union relating to a 2016 Thor Vegas Series Motorhome with a contractual maturity date in August 2037.[7] The debtors' plan does ***not*** propose to reamortize this loan; instead, the debtors propose to cure an outstanding arrearage and otherwise repay the debt according to the obligation's original terms.[8] Despite this plan treatment, the debtors reamortized the debt for purposes of calculating a deduction for debt payment on their Form 122C-2.[9] Once again, an end consequence of the enhanced deduction is a reduction of the debtors' monthly disposable income.

The chapter 13 trustee[10] objected to confirmation of the debtors' plan on several occasions and myriad grounds. One common theme among the trustee's objections is that the debtors' proposed reamortized vehicle deductions on their Form 122C-2 are improper and preclude confirmation of the plan.[11] The debtors' central response to this objection is that the vehicle loans are "910 claims" which must be repaid in full over the plan's term pursuant to the so-called "hanging paragraph" of Bankruptcy Code section 1325(a). The court requested additional briefing so the parties could detail their respective legal positions and authorities regarding this specific issue and then heard oral argument from counsel. The matter is now ready for decision.

---

[6] *See id.* at p. 54 of 62.

[7] *See* Proof of Claim No. 7-1.

[8] *See* ECF No. 2 subpart 3.2.1; ECF No. 39 (modifying plan to correct monthly payment amount and include repayment of creditor's asserted arrearage amount).

[9] *See* ECF No. 1 at p. 52 of 62.

[10] The Bankruptcy Code appoints a private party as a trustee in chapter 13 cases who, among other things, performs certain duties of a chapter 7 liquidating trustee and takes an active role in the chapter 13 plan process (such as by objecting to unconfirmable plans and administering certain payments). *See* 11 U.S.C. § 1302. The trustee generally functions as an actor advocating for the collective interests of creditors and ensuring that the proposed plan complies with the applicable law and rules.

[11] A declaration supporting the trustee's objections includes a helpful exhibit that marks up the debtors' Form 122C-2 with red font, which vividly illustrates the magnitude and consequences of the claimed deductions. *See* ECF No. 63 Ex. B.

**MEMORANDUM OPINION** Page 3

# JURISDICTION & POWER

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding confirmation of the debtors' proposed plan is statutorily "core"[12] and "the action at issue stems from the bankruptcy itself."[13] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

# DISCUSSION

## *Chapter 13 Bankruptcy Generally*

Chapter 13 is a legal structure permitting the adjustment of debts owed by individuals with regular income (including people who were previously called "wage earners").[14] The basic bargain of chapter 13 is that in exchange for the debtors committing certain of their future income or property to repayment of their creditors over a 36- to 60-month plan period and otherwise satisfying the numerous requirements for plan confirmation, the debtors are permitted to retain their other property and receive a discharge of most unsecured debts remaining unpaid after completion of the plan.[15]

---

[12] *See* 28 U.S.C. § 157(b)(2)(L).

[13] *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

[14] *See, e.g.*, *Barnes v. Whelan*, 689 F.2d 193, 197 (D.C. Cir. 1982) ("Chapter 13 was enacted in 1978 as part of a comprehensive revision of the Bankruptcy Act of 1898. It replaced the wage earner's provisions contained in Chapter XIII under the 1898 Act, as amended, and modified prior law in many respects." (footnotes omitted)); *In re Muhammad*, 536 B.R. 469, 476 (Bankr. M.D. Ala. 2015) ("Most Chapter 13 cases involve wage earners. Indeed, Chapter 13 Plans were once referred to as wage-earner plans."). Even earlier bankruptcy law did not include a comparable chapter, but did allow individual debtors to achieve relief broadly similar to what is now available in chapter 13 via a "composition" agreement with their creditors. *See, e.g.*, *Perry v. Commerce Loan Co.*, 383 U.S. 392, 394 (1966) (noting how "statutory relief for the financially distressed wage earner had been available to some extent as early as the Bankruptcy Act of 1867"); *Wilmot v. Mudge*, 103 U.S. 217, 218–21 (1881) (discussing effects of a composition order under the Bankruptcy Act of 1867, as amended in 1874, and ultimately concluding that the composition did not discharge a debt created by fraud).

[15] *See* 11 U.S.C. §§ 1306(b), 1322(a)(1), 1325(b)(1)–(4), 1327(b)–(c), 1328(a); *Harris v. Viegelahn*, 575 U.S. 510, 514 (2015) ("A wholly voluntary alternative to Chapter 7, Chapter 13 allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period. . . . Proceedings under Chapter 13 can benefit debtors and creditors alike. Debtors are allowed to retain their assets, commonly their home or car. And creditors, entitled to a Chapter 13 debtor's 'disposable' postpetition income, usually collect more under a Chapter 13 plan than they would have received under a Chapter 7 liquidation." (citations omitted)).

## *Treatment of Vehicle Loans in Chapter 13 Plans*

Like many Americans, most chapter 13 debtors have one or more vehicle loans, which prompt several common issues about proper treatment of those loans in a chapter 13 plan.

I. The General Framework

Chapter 13 provides four main options for a debtor with a vehicle loan.

***First***, the debtor can propose whatever treatment the lender consensually accepts (i.e., a mutual reworking of the loan).[16] For purposes of the court's Local Form 2083, which is a form chapter 13 plan, the agreed treatment might be specified in subpart 3.2.3, in subpart 3.2.4, or via a nonstandard provision in part 8.

***Second***, the debtor can retain the vehicle while making a stream of monthly payments over the plan term equal to the allowed amount of the lender's secured claim and with interest at a rate resulting in the lender receiving the present value of the secured claim.[17] In a fractured decision, the Supreme Court held that the proper approach to determine the interest rate applicable to cramdown of a secured creditor under a chapter 13 plan is the "formula" approach, whereby courts start with a base rate and then add an upward adjustment.[18] The most common approach to calculating the proper "*Till* rate" is to begin with the national prime rate and make a case-specific upward adjustment in the range of 1% to 3%.[19] Depending on the interest rate environment when a debtor entered into a vehicle loan and when that debtor's chapter 13 plan will become effective, the *Till* rate could be substantially higher than the contractual rate. If the debtor chooses this option, the proposed treatment would be detailed in subpart 3.2.3 or subpart 3.2.4 of the court's form chapter 13 plan.

***Third***, the debtor can surrender the vehicle to the lender.[20] As the Collier treatise explains, "[s]urrender in this context means simply the relinquishment of

---

[16] 11 U.S.C. § 1325(a)(5)(A).

[17] *Id.* § 1325(a)(5)(B).

[18] *See Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). At least in the Ninth Circuit, the *Till* formula approach should also be used in chapter 11 and chapter 12 cases. *See, e.g.*, *In re Key Farms, Inc.*, 2020 Bankr. LEXIS 1642, at *9–11 (Bankr. E.D. Wash. June 23, 2020).

[19] *See, e.g.*, *In re Turcotte*, 570 B.R. 773, 779 (Bankr. S.D. Tex. 2017).

[20] 11 U.S.C. § 1325(a)(5)(C).

any rights in the collateral. Therefore, if the debtor no longer has possession of the collateral, actual delivery by the debtor to the creditor should not be required."[21] Moreover, there is "no requirement that the creditor consent to the surrender or actually accept possession of the collateral."[22] A debtor may exercise this option in subpart 3.4 of the court's form chapter 13 plan.

*Fourth*, only in the case of loans for which the last payment is due after the end of the plan term, the debtor may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending."[23] Long-term debts subject to a "cure and maintain" plan treatment under section 1322(b)(5) are sometimes referred to as "continuing claims."[24] By exercising this option, "the debtor preserves the benefit of a longer payment schedule that extends beyond the due date of the last payment under the plan, and the creditor is protected by the exception to discharge for long-term debts on which defaults are cured."[25] Moreover, treatment under section 1322(b)(5) allows the debtor to keep the original contractual interest rate for the continuing claim, which may be a significant benefit if interest rates have risen such that the *Till* rate would be higher than the contract rate.[26] Section 1322(b)(5) is analogous to the chapter 11 concept of "unimpairment" or "reinstatement" and offers the debtor an ability to effectively leave the holder of a continuing claim with the same payment terms and rights that would apply outside of bankruptcy.[27] In this district, a debtor uses subparts 3.2.1

---

[21] 8 COLLIER ON BANKRUPTCY ¶ 1325.06[4] (16th ed. rev. 2023) (footnote omitted).

[22] *Id.* (footnote omitted).

[23] 11 U.S.C. § 1322(b)(5).

[24] *See, e.g.*, *GMAC v. Smith (In re Smith)*, 259 B.R. 323, 324 (Bankr. S.D. Ill. 2001).

[25] 8 COLLIER ON BANKRUPTCY ¶ 1322.09[4] (16th ed. rev. 2023) (footnote omitted).

[26] *See, e.g.*, *In re Valdes*, 2010 Bankr. LEXIS 3564, at *8 (Bankr. S.D. Fla. Oct. 4, 2010) (discussing how "debtors may take advantage of 11 U.S.C. § 1322(b)(5) by paying the contractual interest rate and contractual amount of principal and interest"). At least one court has limited a chapter 13 debtor's options in the converse scenario when the contractual interest rate is significantly higher than the *Till* rate. *See In re Adkins*, 2015 Bankr. LEXIS 1675 (Bankr. W.D. La. May 14, 2015) (concluding that "[f]ully secured treatment for such claims with interest rates higher than *Till* interest is unfair discrimination against other unsecured creditors whenever the car or other collateral is worth less than the debt and general unsecured creditors are not being paid in full" and therefore denying confirmation of plan that proposed to utilize section 1322(b)(5) in such a scenario).

[27] *See, e.g.*, *In re Simmons*, 288 B.R. 737, 749 n.39 (Bankr. N.D. Tex. 2003) ("Sections 1222(b)(5) and 1322(b)(5) appear to parallel section 1124, which allows a chapter 11 debtor to cure and reinstate (and so leave unimpaired) a class of claims."); *In re Brady*, 86 B.R. 166, 170 (Bankr. D. Minn. 1988) ("Section 1322(b)(5) is the chapter 13 analogue to nonimpairment. It is very similar to the definition of nonimpairment found in § 1124(2) with the notable exception that the chapter 11 provision seems to require that any cure be done immediately on confirmation, while in chapter 13 the cure can be done within a reasonable time.").

and 3.2.2 of the form chapter 13 plan to specify the treatment for a continuing claim arising from a vehicle loan.[28]

## II. Further Constraints Imposed by the "Hanging Paragraph"

In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress added an unenumerated paragraph to the end of Bankruptcy Code section 1325(a) that is frequently called the "hanging paragraph."[29] The hanging paragraph states in full that:

> For purposes of [section 1325(a)(5)], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day period preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

The hanging paragraph provides certain protected treatment regarding a vehicle lender's purchase money security interest if the debt arose during the referenced 910-day period.[30] To track the parties' briefing, this opinion calls a claim within the hanging paragraph's scope a "910 claim."

---

[28] In contrast to the option available for claims secured by real property where there is no arrearage due, the form plan provides no option for the debtor to pay a continuing claim based on a contractually current vehicle loan directly, or "outside of the plan." *See generally* Local Form 2083 (Bankr. E.D. Wash.) subpart 3.3 (limiting the universe of secured claims that can be paid directly by the debtor to contractually current debts secured by real property); LBR 2083-1(j)(1) (Bankr. E.D. Wash. rev. Sept. 20, 2021) (requiring that all payments on debts secured by personal property be paid through the trustee "unless otherwise ordered by the court"). Since the issue is not before the court here, the court does not decide whether the form plan is missing an option that should be available to chapter 13 debtors or whether direct payment of a nondelinquent continuing claim arising from a vehicle loan might be an appropriate nonstandard provision in part 8 of the form plan.

[29] This paragraph is sometimes called other names, including the "flush paragraph," the "unnumbered paragraph," or "section 1325(a)(*)." Some courts and attorneys mistakenly read or cite this paragraph as being part of section 1325(a)(9). As with much of BAPCPA, the placement and drafting of this paragraph leave much to be desired as a matter of statutory craftmanship. *See, e.g., Dumont v. Ford Motor Credit Co. (In re Dumont)*, 581 F.3d 1104, 1110 (9th Cir. 2009) ("BAPCPA has been criticized for its lack of clarity [and] is hardly the very model of a well-drafted statute." (footnote omitted)).

[30] Parties may dispute whether particular debts are part of the purchase money security interest (or PMSI) for purposes of the hanging paragraph. For example, in the Ninth Circuit, so-called "negative equity" resulting from the rollover of a prior vehicle loan into the new loan for the purchase of a different vehicle is not part of the PMSI and thus is not protected by the hanging paragraph. *See AmeriCredit Fin. Servs., Inc. v. Penrod (In re*

A primary dispute between the parties is whether the hanging paragraph requires that a 910 claim arising from a loan with a contractual maturity later than the end of a chapter 13 plan's term ***must*** be reamortized and paid in full under the plan. To resolve this dispute the court considers the text, context, and purpose of the hanging paragraph.[31]

Beginning with the text, nothing in the hanging paragraph states anything about the temporal period during which a 910 claim may or must be paid. Instead, the text merely operates to negate Bankruptcy Code section 506 in certain contexts. One function of section 506 is to "bifurcate" or "split" an undersecured claim "into secured and unsecured claims."[32] As an example, absent the hanging paragraph, a vehicle lender holding a claim of $50,000 secured by collateral worth $30,000 would have a secured claim of $30,000 and an unsecured "deficiency" claim of $20,000—the unsecured claim could yield only a small dividend under the debtor's plan. The hanging paragraph stops this bifurcation and leaves the lender with one secured claim of $50,000. The plain text of the statute, when read together with section 506, makes quite clear that "[t]he hanging paragraph prevents the bifurcation of certain claims."[33] But the text does not suggest that the hanging paragraph does any work beyond stopping such bifurcation. Indeed, other courts have hesitated to give the hanging paragraph functions beyond negating section 506 bifurcation in the context of cramdown of a 910 claim.[34]

To be sure, there are cases generally stating that a 910 claim must be paid within the plan term.[35] But these cases were not dealing with 910 claims arising

---

*Penrod)*, 611 F.3d 1158, 1164 (9th Cir. 2010). There is disagreement among courts about whether other add-ons beyond the purchase price of the vehicle itself are part of the PMSI. *Compare, e.g.*, *In re Jones*, 583 B.R. 749, 759 (Bankr. W.D. Wash. 2018) (concluding that the PMSI does not include "sums advanced to pay for optional gap insurance and vehicle maintenance contracts"), *with, e.g.*, *In re Bunge*, 2018 Bankr. LEXIS 1153 (Bankr. W.D. Wash. Apr. 16, 2018) (contra).

[31] *See, e.g.*, *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 64 (2011) (determining meaning of the Bankruptcy Code based on "the text, context, and purpose of the statutory provision at issue"); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (describing how statutory interpretation "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis").

[32] *In re Penrod*, 611 F.3d at 1161. *See also* 11 U.S.C. § 506(a).

[33] *In re Penrod*, 611 F.3d at 1161.

[34] *See, e.g.*, *Wells Fargo Fin. Acceptance v. Rodriguez (In re Rodriguez)*, 375 B.R. 535, 548–49 (B.A.P. 9th Cir. 2007) (concluding that the hanging paragraph has "no effect on the deficiency claims of 910 creditors who are the recipients of section 1325(a)(5)(C) surrenders").

[35] *See, e.g.*, *Trejos v. VW Credit, Inc. (In re Trejos)*, 374 B.R. 210, 220 (B.A.P. 9th Cir. 2007) (concluding that "the bankruptcy court did not err in requiring that the Plan pay the full amount" of a 910 claim); *In re Brooks*,

from loans with a contractual maturity beyond the plan term. As such, these decisions never address the reamortization question raised in this case; the cases instead simply recite a conclusion that is necessarily true whenever a 910 claim would be repaid within the plan term based on the loan's contractual maturity.

Turning to the broader statutory context, the hanging paragraph by its terms is limited to treatment under section 1325(a)(5) and does not extend to the separate option provided to debtors by section 1322(b)(5). The majority view is that the two treatment routes provided by sections 1322(b)(5) and 1325(a)(5) are "mutually exclusive" and thus the requirements of section 1325(a)(5) are inapplicable and need not be satisfied when a debtor elects to cure and maintain a continuing claim.[36] For the debtors' legal position to be correct, the court would need to somehow construe the hanging paragraph as creating a *sub silentio* exception for all 910 claims from section 1322(b)(5)'s sweeping reference to "any unsecured claim or secured claim." This would be a major exception that significantly cabins a debtor's ability to cure and maintain vehicle loans.[37] Courts generally reject statutory interpretations relying on "such roundabout drafting."[38] The overall context of chapter 13 therefore leads to the conclusion that the hanging paragraph does not categorically eliminate a debtor's ability to cure and maintain a continuing claim that is also a 910 claim.

---

344 B.R. 417, 422 (Bankr. E.D.N.C. 2006) ("[I]n order to confirm a Chapter 13 plan with a 910 claim, the plan must provide for full payment of the secured claim with interest calculated at the *Till* rate."); *In re Johnson*, 337 B.R. 269, 273 (Bankr. M.D.N.C. 2006) (concluding that "[the hanging paragraph] prevents a debtor from paying less than the full contract amount if the debtor chooses to retain the vehicle"; thus, the plan must provide for either full payment of the 910 claim or surrender of the vehicle); *In re Henry*, 353 B.R. 261, 263 (Bankr. D. Or. 2006) (finding that an uncontested 910 claim is "therefore an 'allowed secured claim' for purposes of § 1325(a)(5) and the value of its claim, as of the effective date of the plan, must be paid over the life of the plan"); *In re Turner*, 349 B.R. 431, 442 (Bankr. D.S.C. 2006) ("[S]ecured creditors subject to the flush language of § 1325(a) . . . must be repaid in full through a Chapter 13 plan if debtors wish to retain the collateral securing the claim." (footnote omitted)).

[36] *See, e.g.*, *Asociación de Empleados del Estado Libre Asociado de Puerto Rico v. Nieves (In re Nieves)*, 647 B.R. 809, 826–27 (B.A.P. 1st Cir. 2023) (describing the majority view); *In re Hayes*, 111 B.R. 924, 926 (Bankr. D. Or. 1990) ("[U]nder § 1322(b)(5) and § 1325(a)(5) the debtor has two alternatives for treatment of a claim secured other than by a security interest in the principal residence. He or she may either leave the contract intact (maintain and cure) or alter the terms and pay the present value of the secured claim (cram-down).").

[37] Most vehicle loans that are of sufficient duration to create a continuing claim will also yield a 910 claim. In the context of a three-year plan, the original vehicle loan would need to have a term of at least 67 months to result in a continuing claim that was not also a 910 claim. In the context of a five-year plan, the original vehicle loan would need to have a term of at least 91 months to result in a continuing claim that was not also a 910 claim.

[38] *E.g.*, *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021). *See also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Finally, the court considers the hanging paragraph's purpose, which is to prevent debtors from using the bankruptcy process to "strip down" the amount of a 910 claim to the vehicle's value and thereby avoid paying the loan in full.[39] Without the hanging paragraph, bifurcation under Bankruptcy Code section 506 presents a significant risk for many vehicle lenders given how a vehicle's value usually rapidly depreciates as soon as it is driven off the lot, leaving the loan underwater and thus with a deficiency component that could be stripped down in bankruptcy. The hanging paragraph eliminates this risk. Eliminating this risk provides a significant advantage for the vehicle lender vis-à-vis the debtor and other creditors.[40] It is a bridge too far, however, to conclude that the goal of protecting certain vehicle lenders from having their loans stripped down also compels those loans to be reamortized under Bankruptcy Code section 1325(a)(5)(B). If the statute required this outcome, then the vehicle lender would be advantaged in multiple ways, including (i) being protected from bifurcation, (ii) receiving repayment of the loan earlier than would occur outside of bankruptcy, and (iii) potentially realizing an increase in the interest rate from the contractual rate to the *Till* rate.[41] These multiple advantages not only would preserve the lender's nonbankruptcy bargain (which is the goal of the hanging paragraph), but also could leave the lender in a better position than the lender would occupy had there never been a bankruptcy filing. The Bankruptcy Code should be construed to avoid giving anyone "a windfall merely by reason of the happenstance of bankruptcy."[42]

In sum, nothing about the text, context, or purpose of the hanging paragraph indicates that chapter 13 debtors **must** always reamortize long-term 910 claims. The hanging paragraph deals solely with a quantitative aspect of repayment by preventing bifurcation and provides no direction about any temporal aspect of repayment. As such, subject to other limitations in the Bankruptcy Code (including those discussed below), debtors retain optionality to address 910 claims in one of four ways: (i) reach a consensual arrangement with the lender; (ii) cram

---

[39] *See, e.g.*, *In re Trejos*, 374 B.R. at 220.

[40] *See, e.g.*, *In re Strange*, 424 B.R. 584, 591–92 (Bankr. M.D. Ga. 2010) (discussing how "the hanging paragraph provide[s] special treatment to 910 creditors over other unsecured creditors" and "diminishes the pool of money available to pay the other unsecured creditors," all of which is consistent with "an unambiguous implication by Congress to prefer 910 creditors over other unsecured creditors").

[41] The interest rate issue is potentially presented by this case. The current prime rate of interest is 8.5%, which means that *Till* compels a rate of between 9.5% to 11.5%. The contractual rates for the two loans the debtors propose to reamortize are 5.49% and 6.84%, which means the lenders could insist on a significant increase to the interest rates. Neither lender chose to object to confirmation on this basis.

[42] *See, e.g.*, *Lewis v. Mfrs. Nat'l Bank*, 364 U.S. 603, 609 (1961) (Douglas, J.).

the claim down through the plan at a *Till* rate of interest (and without bifurcation); (iii) surrender the vehicle; or (iv) in the case of a continuing claim, cure and maintain the loan.

### III. Other Limitations on the Accelerated Reamortization of a 910 Claim

A given chapter 13 debtor's ability to elect a particular plan treatment option might be limited based on the particular facts of that debtor's case by chapter 13's "good faith" requirements.[43] The Ninth Circuit Court of Appeals has interpreted these requirements to mean that bankruptcy courts should engage in "a fact-intensive examination of the 'totality of the circumstances'" that "assesses whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner."[44] This broad inquiry, however, "is not a vehicle to promulgate bankruptcy requirements not already in the Code."[45]

Several other bankruptcy courts have found that proposed accelerated payments to secured creditors were, based on the facts of the particular cases, abusive and thus denied confirmation of chapter 13 plans predicated on such payments.[46] In one case, Bankruptcy Judge Dale L. Somers specifically considered

---

[43] *See* 11 U.S.C. § 1325(a)(3), (a)(7).

[44] *In re Sisk*, 962 F.3d 1133, 1150 (9th Cir. 2020) (internal quotation marks and citations omitted). This analysis is notably more substantive and arguably in tension with the more limited analysis the Ninth Circuit Court of Appeals has applied in the context of chapter 11's analogous confirmation requirement. *See, e.g.*, *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019) (limiting section 1129(a)(3)'s reach "only to the proposal of a plan, not the terms of the plan"); *In re Claar Cellars LLC*, 623 B.R. 578, 591 (Bankr. E.D. Wash. 2021) (explaining that pursuant to the *Garvin* decision, "[s]ection 1129(a)(3)'s focus is thus on the plan proponent's actions specifically related to the plan proposal process, rather than whatever actions might occur pursuant to the plan itself or the proponent's behavior during the bankruptcy case more generally").

[45] *In re Sisk*, 962 F.3d at 1150. *See also, e.g.*, *Drummond v. Welsh (In re Welsh)*, 711 F.3d 1120, 1131 (9th Cir. 2013) ("We cannot conclude, however, that a plan prepared completely in accordance with the very detailed calculations that Congress set forth is not proposed in good faith. To hold otherwise would be to allow the bankruptcy court to substitute its judgment of how much and what kind of income should be dedicated to the payment of unsecured creditors for the judgment of Congress.").

[46] *See, e.g.*, *In re Pearson*, 398 B.R. 97, 99, 104 (Bankr. M.D. Ga. 2008) (denying confirmation of plan in which the debtors "propose to pay the secured claims about $100 more per month than the monthly payments required under the terms of their contractual obligations" and thereby "accelerate" payment relative to secured creditors); *In re Liles*, 292 B.R. 138, 139 (Bankr. E.D. Tex. 2002) (denying confirmation of plan that proposed to increase the debtors' monthly mortgage payment from $408.00 to $979.18, thereby "effectively pre-paying the secured indebtedness over the life of the Plan"); *In re Crussen*, 264 B.R. 723, 723–24 (Bankr. W.D. Okla. 2001) (denying confirmation of plan in which the debtor "proposes to pay an extra $650 per month toward the second mortgage on his home and thereby pay the second mortgage in full in 36 months while paying only 44% of the amounts owed to unsecured creditors" (footnote omitted)); *In re Pope*, 215 B.R. 92, 93 (Bankr. S.D. Ga. 1997) (denying confirmation of plan that proposed to reamortize a mobile home loan over the five-year plan term,

whether the debtor could properly repay a 910 claim on an accelerated basis rather than cure and maintain the vehicle loan under Bankruptcy Code section 1322(b)(5).[47] Judge Somers concluded "that under the facts of this case, the Debtor's plan would unfairly manipulate the Bankruptcy Code by giving him a benefit at the expense of his unsecured creditors in a way not explicitly authorized by the Code."[48] As Judge Somers explained, "[o]rdinarily, a debtor cannot use money that would otherwise go to his or her unsecured creditors in order to accelerate the payments on a secured debt and pay it off faster than the prepetition security agreement requires."[49]

Harmonizing the decisions from other bankruptcy courts with binding Ninth Circuit precedent yields a regime under which the court must consider, on a case-by-case basis and under the totality of the circumstances, whether the proposed accelerated repayment of a long-term claim—including a 910 claim that is also a potential continuing claim—would be inappropriately detrimental to a debtor's unsecured creditors. If so, chapter 13's good faith requirements may restrict the optionality the debtor otherwise enjoys regarding treatment of a 910 claim.

### *The Role of Expense Deductions in Calculating Disposable Income*

For above-median debtors, the expenses that may be deducted to determine the debtors' "disposable income" (and hence the starting point for the "projected disposable income" that must be devoted to plan payments) are regulated by the so-called "means test" in Bankruptcy Code section 707(b)(2).[50]

For purposes of this dispute, the relevant part of the means test is section 707(b)(2)(A)(iii), which states:

> The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

---

which "is unusual because it would result in the accelerated repayment of a long term debt into a short term plan" to the detriment of unsecured creditors). *See also generally* David Gray Carlson, *The Res Judicata Worth of Illegal Bankruptcy Reorganization Plans*, 82 TEMP. L. REV. 351, 393 n.351 (2009) (discussing how "courts sometimes find it is bad faith for a debtor to accelerate payment to secured creditors beyond the payments required in the installment contract, as this shifts the burden of payment from debtors to the unsecured creditors who receive less disposable income").

[47] *See In re Jackson*, 2015 Bankr. LEXIS 1785 (Bankr. D. Kan. May 29, 2015).

[48] *Id.* at *6.

[49] *Id.* at *10.

[50] *See* 11 U.S.C. § 1325(b)(2)–(3); *Ransom*, 562 U.S. at 65; *Bledsoe v. Cook*, 70 F.4th 746, 748 (4th Cir. 2023).

> (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and
>
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
>
> divided by 60.

When assessing what is "scheduled as contractually due" to a secured creditor, many courts simply look to what is owed under the applicable prebankruptcy contract.[51] Other courts have adopted an approach under which the proposed plan terms influence this analysis.[52] Still other courts have criticized this second approach and refused to let the proposed plan terms alter how the initial "disposable income" formula is applied.[53]

This court determines that for purposes of assessing a chapter 13 debtor's disposable income, the better reading of the statute confines what is "contractually due to secured creditors" to the pre-plan state of affairs. The court reaches this conclusion for multiple reasons.

***First***, the Bankruptcy Appellate Panel for the Ninth Circuit has repeatedly interpreted the statute to mean that "section 1325(b)(3)—which incorporates section 707(b)—requires a static, backwards-looking inquiry, since 707(b) itself requires such an analysis."[54] This reading of the text is entirely consistent with the

---

[51] *See, e.g.*, *Bledsoe v. Cook*, 70 F.4th at 748 (reciting how the "the amounts 'contractually due to secured creditors'" were "what the [debtors] owe under their mortgage agreement").

[52] *See, e.g.*, *Thissen v. Johnson*, 406 B.R. 888, 895–96 (E.D. Cal. 2009); *In re McPherson*, 350 B.R. 38, 46–47 (Bankr. W.D. Va. 2006).

[53] *See, e.g.*, *In re Varner*, 2009 Bankr. LEXIS 1291, at *8–14 (Bankr. D. Idaho May 22, 2009); *In re Richardson*, 2009 Bankr. LEXIS 773, at *5–6 (Bankr. C.D. Ill. Jan. 8, 2009); *Dehart v. Hay (In re Hay)*, 413 B.R. 198, 203–04 (Bankr. M.D. Pa. 2008); *In re Willette*, 395 B.R. 308, 326–28 (Bankr. D. Vt. 2008).

[54] *Am. Express Bank, FSB v. Smith (In re Smith)*, 418 B.R. 359, 369 (B.A.P. 9th Cir. 2009); *Yarnall v. Martinez (In re Martinez)*, 418 B.R. 347, 356 (B.A.P. 9th Cir. 2009) (same quotation with a slightly varied sentence structure). *See also Drummond v. Welsh (In re Welsh)*, 465 B.R. 843, 850 (B.A.P. 9th Cir. 2012) (reiterating backwards-looking point from *Smith* and *Martinez*), *aff'd*, 711 F.3d 1120 (9th Cir. 2013); *In re Ng*, 2011 Bankr.

Supreme Court's decision in *Hamilton v. Lanning*, which adopted a forward-looking approach for purposes of Bankruptcy Code section 1325(b)(1)(B) based on that subparagraph's use of the word "projected."[55] The forward-looking approach used to determine a debtor's "projected disposable income" may appropriately differ from the approach used to determine the expense inputs that are fed into quantification of "disposable income" through the means test.

*Second*, allowing the proposed plan treatment to calibrate the appropriate deductions for purposes of determining whether the plan is confirmable introduces a problematic circularity. Although a plan may be binding on a chapter 13 debtor and creditors (either as an order, or a contract, or both) once confirmed,[56] an unconfirmed plan is simply the debtor's proposal, not binding on anyone, and without effect on the pre-confirmation status quo if confirmation is denied.[57] A legal construct that allows the debtor to propose a certain payment in the plan and then use that same proposed payment as an expense deduction to support confirmation of the plan invites bootstrapping behavior. Additionally, if all payments on every secured debt to be paid under a plan are, *ipso facto*, "amounts scheduled as contractually due to secured creditors," then the "contractually" modifier becomes superfluous and meaningless (at least in chapter 13 cases), which is an interpretation that should be avoided.[58]

*Third*, the court's interpretation of the statute fits with the structure of Form 122C-2.[59] In Part 1 of the form, a debtor should list the payments that would

---

LEXIS 583, at *6 (Bankr. D. Haw. Feb. 9, 2011) (describing how the analysis under Bankruptcy Code section 1325(b)(2)–(3) involves a two-step process where "[t]he second step, which incorporates the means test, uses a static, backwards-looking approach to determine the amount of the expenditures"). *Accord Morse v. Rudler (In re Rudler)*, 576 F.3d 37, 52 (1st Cir. 2009) (discussing, in the context of interpreting Bankruptcy Code section 707(b)(2)(A)(iii)(I) in a chapter 7 case, how a "mechanical approach avoids the uncertainties that surround a debtor's announced, but not yet executed, plan" regarding the collateral).

[55] *See* 560 U.S. 505 (2010).

[56] *See* 11 U.S.C. § 1327(a).

[57] *See, e.g.*, *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502–03 (2015).

[58] *Cf. In re Middleton*, 2023 Bankr. LEXIS 2195, at *6–9 (Bankr. W.D. La. Sept. 6, 2023) (concluding that a debt which had been reduced to judgment is not "contractually due" and thus may not be listed as a deduction on a chapter 13 debtor's Form 122C-2; noting that "[i]f Congress had wanted debtors to deduct monthly payments for ***all*** secured debts, it could have omitted the phrase 'contractually due' altogether," because "[w]ithout that phrase, a debtor would be eligible to claim a deduction for all amounts due under any secured claim").

[59] Any inconsistency between an official form and the statute must ultimately be resolved in the statute's favor. *See, e.g.*, *In re Moore*, 2008 Bankr. LEXIS 1053, at *14 n.8 (Bankr. M.D.N.C. Apr. 2, 2008) (reciting how "a statute controls if an official form is inconsistent with such statute"); *In re Arnold*, 376 B.R. 652, 653 (Bankr. M.D. Tenn. 2007) (introducing the matter by noting that in a conflict between the Bankruptcy Code and an official form, "the Bankruptcy Code always wins").

actually be due under the debtor's vehicle loan agreement, consistent with the backwards-looking approach described by the Bankruptcy Appellate Panel. Then, in Part 3 of the form, a debtor can list the postpetition changes to the debtor's expenses that the debtor anticipates will result under the proposed plan, consistent with the forward-looking approach adopted in *Hamilton v. Lanning*. This methodology will allow the chapter 13 trustee and the court to assess what result would obtain based on a historical-driven calculation of "disposable income" while also evaluating whether the "projected disposable income" should be calculated differently based on the events the debtor expects to occur under the plan. Separating the two inquiries allows everyone to independently analyze whether the plan is confirmable (and hence whether the Part 3 adjustments should actually happen) and thus avoid the circularity that creeps into the analysis if the plan's proposed payments flow directly into the deductions listed in Part 1.

To recapitulate, the court concludes that for purposes of the means test under Bankruptcy Code section 707(b)(2)(A)(iii), including as it is made applicable in chapter 13 cases by Bankruptcy Code section 1325(b)(3), the debtor should use the amounts payable to a secured creditor under the applicable prepetition contract. Consistent with *Hamilton v. Lanning*, the debtor can then advocate for upward adjustments to the deduction for purposes of ascertaining the projected disposable income that ultimately must be paid into a chapter 13 plan.

## ANALYSIS OF THE OBJECTION & GROUNDS FOR DISMISSAL

For several reasons, the court finds and concludes both that the chapter 13 trustee's objection presents sufficient bases to deny confirmation under Bankruptcy Code section 1325 and that sufficient cause exists to dismiss this case under Bankruptcy Code section 1307(c).

*First*, based on a holistic assessment of the totality of the circumstances, the court agrees with the trustee that the debtors are not proceeding in good faith. More specifically, the court notes the following troubling aspects of this case:

- According to the trustee's uncontested calculations, the economic effect of the proposed accelerated payments to two vehicle lenders under the plan is a transfer of roughly $453 per month from the unsecured creditor pool to repayment of the debtors' vehicle lenders—these payments will result in an aggregate shift of $27,186.60 of value over the life of the plan toward satisfaction of vehicle loans that the debtors must pay in full in any event. The court declines to adopt any categorical or brightline rule

for exactly how much of a value shift is too much, but the court is confident the amount that would occur here is excessive. The proposed plan would provide the debtors with an inappropriate "head start" at the expense of their unsecured creditors rather than offering a chance at bankruptcy's "fresh start."[60]

- The debtors purchased multiple vehicles, including the brand new 2023 Hyundai Santa Cruz, just a few months before filing for bankruptcy and now hope to use the process to facilitate their early repayment of two of those vehicles at other creditors' expense. One of BAPCPA's purposes is to deter debtors from "loading up" on new debt in contemplation of a bankruptcy filing.[61] These debtors made a choice to "load up" on acquiring several vehicles with debt financing shortly before filing for bankruptcy and should bear the economic consequences of their choice rather than shifting the costs to their unsecured creditors.

- The debtors' positions are internally inconsistent. The debtors assert that the hanging paragraph requires reamortization of 910 claims, but the debtors' plan does not propose to reamortize the loan with Horizon Credit Union regarding the debtors' motorhome. Similarly, the debtors argue that the numbers used on Form 122C-2 should flow from the plan, but they actually listed enhanced, accelerated deductions related to the motorhome. These inflated deductions do not track the proposed plan treatment for this debt nor do they have any other cognizable basis. The debtors do not appear to be approaching the bankruptcy process in an entirely principled matter, but appear instead to want to deploy the process for their personal benefit.[62]

---

[60] *See, e.g.*, *McLaughlin v. Jones (In re Jones)*, 114 B.R. 917, 926 (Bankr. N.D. Ohio 1990) ("The Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. Bankruptcy protection was not intended to assist those who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors. Good faith and candor are necessary prerequisites to obtaining a fresh start. The bankruptcy laws are grounded on the fresh start concept. There is no right, however, to a head start." (citation omitted)).

[61] *See, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 240–41, 244 (2010).

[62] At oral argument, debtors' counsel offered explanations about these incongruities. Regarding the divergent plan treatments, counsel contended that Horizon Credit Union has effectively consented to the plan treatment and thus waived any right to insist on whatever reamortization counsel urges is otherwise mandatory under the hanging paragraph. While that may be true ***now***, the plan filed on the petition date already contained the differing treatments and the debtors could not have known then what treatment might be acceptable to which creditors. Regarding the accelerated deduction for the motorhome, counsel acknowledged that this deduction is at odds with the debtors' legal position and thus their Form 122C-2 must be revised. The need for such a revision has been apparent for some time, however, and the debtors have not addressed the issue. To be clear,

At day's end, all the facts driving the result in *In re Jackson*[63] are present here to an equal or even greater extent. As such, the court follows Judge Somers' lead and finds that the debtors' proposed chapter 13 plan cannot be confirmed.

***Second***, the court also agrees with the trustee that the debtors have used improper numbers on their Form 122C-2. As discussed above, the better approach would be to use the prepetition contractual payments in Part 1 of the form for purposes of calculating the "disposable income" and then to indicate in Part 3 of the form any proposed adjustments that the debtors believe bear on the ultimate "projected disposable income" that must be used to fund the plan. Here, the debtors' responses incorrectly and materially understate their disposable income.

***Third***, the debtors' case has been pending since May 2023 and the court has held six hearings related to confirmation (including several hearings since this case was moved to the court's dismissal docket in October 2023). The current plan is not confirmable and the delay in reaching a confirmable plan is negatively affecting creditors (for example, the court notes that two creditors have successfully moved for relief from stay[64]). These considerations provide sufficient cause for dismissal under Bankruptcy Code section 1307(c).[65] Nothing about the facts presented here suggests that conversion to chapter 7 would be in the best interests of creditors or the estate. Therefore, the court determines that dismissal of the case is the appropriate path.[66]

## SUMMATION

The debtors have proposed an unconfirmable plan predicated on inappropriate reamortization of long-term vehicle loans to the detriment of their unsecured creditors. Because the plan cannot be confirmed and the case has been pending for many months without an end point in sight, dismissal is appropriate. The court will enter a separate order dismissing this chapter 13 case.

---

the court does not find that anyone has engaged in any inappropriate behavior, but there nevertheless is an intellectual inconsistency surrounding some of the debtors' positions and the inconsistency seems only to break in the debtors' favor.

[63] 2015 Bankr. LEXIS 1785.

[64] *See* ECF Nos. 28, 80.

[65] *See, e.g.*, 11 U.S.C. § 1307(c)(1), (3), (5); *In re Zamora*, 2020 Bankr. LEXIS 1963, at *14–16, *20–21 (Bankr. E.D. Wash. July 27, 2020). As in *Zamora*, the court concludes that the need for speed and efficiency weighs against granting any additional time here to remedy the defects via yet another or modified plan. *See* 2020 Bankr. LEXIS 1963, at *20–21.

[66] *See id.* at *21–25.